FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2016 APR 18  AM 10: 26

CLERK_____
SO. DIST. OF GA.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

**CV 416-092**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. CHARLES JACKSON | ) | |
| | ) | Civil Action No. _____ |
| Plaintiff-Relator, | ) | Jury Trial Demanded |
| | ) | FILED UNDER SEAL |
| v. | ) | |
| | ) | |
| SESOLINC GROUP, INC. and | ) | |
| HARRY FORD III, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Relator, Charles Jackson (hereafter "Relator"), on behalf of himself and the United States of America, brings this action and would show the following:

### JURISDICTION AND VENUE

1.     This action arises under the Federal False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*

2.     This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

3.     This court has personal jurisdiction over Defendants and is a proper venue pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) in that Defendants

do or transact business in this jurisdiction and the violations of the False Claims

Acts described herein were carried out in this district.

## THE PARTIES

4.      Sesolinc Group, Inc. (formerly Southeastern Solutions Inc.)

manufactures and supplies pre-fabricated small buildings and equipment

systems to the United States military.

5.      Sesolinc is a veteran-owned, small business with products and

services available via U.S. General Services Administration Schedules Contract

GS-07F-0360K, Defense Logistics Agency National Stock Numbers, and the

FEDBIZOPPS/FEDBID network.

6.      Sesolinc's principal office address is 50 S East Ocean Blvd, Ste 202,

Stuart, FL 34994.

7.      Sesolinc maintains a manufacturing facility at 806 Randy Lowery

Rd, Statesboro, GA 30461. Most if not all of the systems described herein were

manufactured at this or other Statesboro facilities, including all of the systems

with defective wiring.

8.      At times relevant to this action, including in or about 2011-2012,

Sesolinc's corporate office was located at 131 Hutchinson Island Rd., Ste 101-102,

Savannah, GA 31421.

2

9. At times relevant to this action, including in or about 2011-2014, Sesolinc perpetrated the fraud described herein on the United States military at Fort Stewart in Hinesville, Georgia.

10. Sesolinc is owned and operated by Harry Ford III.

11. Relator Charles Jackson is a former U.S. Army combat engineer, electrician, and contractor who worked for Sesolinc as a salesman from 2011-2015.

12. Mr. Jackson has a long career in construction, beginning as a combat engineer with the U.S. Army from 1979 through 1986.

13. Mr. Jackson has over 35 years of experience in all elements of construction, including electrical, plumbing, carpentry, equipment operation, demolition, and renovation.

14. Mr. Jackson worked as a salesman for Sesolinc in the western United States, including training the military customers in the use of Sesolinc equipment, from July 2011 through August 2015.

15. Mr. Jackson had customers in Arizona, California, Colorado, Idaho, Kansas, Missouri, Nevada, New Mexico, Texas, and Utah.

3

## FRAUDULENT SCHEMES

### Sesolinc Knowingly Manufactured Defective Systems and Sold them to the United States Military

16.     In 2011, Mr. Jackson was hired to work at Sesolinc.

17.     On his very first tour of the Sesolinc manufacturing facility in Statesboro, Georgia in 2011, Mr. Jackson, with 30+ years of experience and training as an electrician, identified significant defects in Sesolinc's manufacturing process.

18.     Mr. Jackson saw that the company was using the wrong wiring, bushings, boxes, and other parts in its assembly of various systems, including but not limited to battery and refrigeration systems.

19.     Mr. Jackson learned that just prior to his hiring, a new electrician had been hired to replace an electrician who had been fired because the systems "took too long" to wire.

20.     Upon information and belief, this "other electrician" was actually another company, as discussed below; instead of partnering with another company, Ford hired an incompetent (but fast) electrician to cut corners and save time, and to enable Ford to pocket the fifty percent of the profit that he had formerly been sharing with his silent subcontractor.

4

21.    A common problem with all of Sesolinc's systems from approximately 2011-2014 was the wiring, including but not limited to incorrect wire types, improper grounding, lack of wire protection conduits, and lack of proper insulation at wall penetrations.

22.    Specifically, because the wiring was not the proper type or sufficiently protected, wires would rub up against other wires and against the unit itself when bouncing around in transit. This could result in electrical shocks, shortages, outages and even fires.

23.    On or about August 21, 2012, Relator Jackson made a video identifying problems with a Tactical Battery Maintenance System's wiring that had been delivered to Fort Bliss, Texas, which he sent to VP/Direct Supervisor McLawrence Williams.

24.    The problems shown in the video were the result of the deficient manufacturing process used to build all of Sesolinc's systems.

25.    Sesolinc's products have two features that make them particularly valuable: mobility (they can be placed on a truck and transported between troop locations) and hard wiring capability (they can be "plugged in" and do not require a portable generator to run).

5

26.     These two features are aggressively marketed by Sesolinc as distinguishing Sesolinc's products from the competition, and are material to the military's decisions to purchase Sesolinc systems.

27.     Mr. Jackson sold these same systems to military bases around the country and would visit them after the final products were delivered.

28.     In so doing, he discovered the same defects consistently occurred in all of Sesolinc's systems and so he would make repairs to them himself onsite when possible.

29.     These repairs did not occur at the bases visited by the other salesmen, who were not trained electricians.

30.     Mr. Jackson reported his findings to his superiors Williams and Ford, but his concerns were ignored.

31.     Even though Mr. Jackson continued reporting this same problem for years, Sesolinc refused to rectify it.

32.     Finally, in fall 2014, a series of customer complaints incited an investigation by the Army and DLA into Sesolinc's Tactical Battery Maintenance Systems.

33.     In or about August 2014, a battery system at Fort Lewis broke when it was plugged in.

6

34.     Sesolinc's initial response was that the problem was entirely user-error because the unit had been plugged into the "wrong outlet"; that this was not a warranty issue; and that Sesolinc would charge to come onsite to fix it.

35.     The customer called the local electrical inspectors who made comments such as "[Sesolinc] is maliciously killing troops" and "[Sesolinc] is just like GE and Haliburton; it's going to take 13 deaths before you fix the fuck up."

36.     Upon information and belief, the electricians making these statements had actually examined the wiring in question and understood that the problems with these units were much greater than being plugged into the "wrong outlet."

37.     In a memo from October 20, 2014, CEO Harry Ford wrote to the US Army that Sesolinc's more than 1,000 products and over 200 Tactical Battery Maintenance Systems in service were free of defect and did not present a material risk for personal injury and/or equipment damage.

38.     The memo further stated that "As a result of the concerns alleged, SESOLINC has conducted a review of its materials and designs by electrical consultants, who found these elements sound."

39.     On October 21, 2014, Sesolinc's attorney, Matthew Bush, wrote an email to the military on behalf of Sesolinc denying any and all knowledge or liability:

> [Sesolinc] wants to make clear that any claim that its array of products, generally, or any of the over 200 Tactical Battery Maintenance Systems in service specifically, cannot perform their mission goals, or represent a risk of imminent harm to military or civilian personnel, is untrue.

40.     These statements by Ford and Bush were false.

41.     In fact, the exact same problem had occurred at Fort Bliss around the same time and had been identified by TACOM as a potential shock hazard.

42.     To cover up its problems, Sesolinc fired the electrician in charge at the Statesboro factory and ultimately, in December 2014, hired a subcontractor to handle all future electrical work.

43.     Finally, on November 18, 2014, in an attempt to salvage its relationships with the military, Sesolinc acknowledged there was a problem, announced it had overhauled its production process. The company then purported to initiate a warranty program to repair previously sold units, offering to bring them into compliance with the National Electric Code.

44.     This resulted in a massive inconvenience for the military, as all stateside shelters had to be inspected and shipped back to Statesboro for repairs.

8

45.     Sesolinc never admitted to having prior knowledge of the defects.

46.     Upon information and belief, Sesolinc only offered to fix approximately 100 of the approximate 200 defective units it had sold to the military.

47.     For example, upon information and belief, only 9 to 11 of the 29 systems at Fort Bragg were repaired.

48.     Excepting that the warranty applied only to units delivered prior to October 24, 2014, it is not immediately clear why some systems were repaired and others were not. The pre-October 2014 units were individually inspected, and only those identified as being deficient were repaired.

49.     Upon information and belief, as Relator Jackson had personally seen that a majority of Battery Systems delivered prior to that date were wired improperly, this inspection (conducted by Sesolinc itself) was disingenuous.

50.     Shelters that were deployed overseas or in Hawaii also were not inspected or repaired.

51.     Relator Jackson was contacted by some of his clients asking whether their systems were going to be repaired, and was instructed by Ford not to answer any of the military's questions.

52.     Relator Jackson is not aware of Sesolinc having repaired the Battery Systems located west of the Mississippi, including any of those in his territory.

53.     Relator Jackson continued to receive emails from his former customers after he was terminated about electrical problems with the Battery Systems.

54.     Moreover, and more importantly, Sesolinc wired all of its systems, and not just the Battery Systems, in this same negligent fashion.

55.     In a December 29, 2014 email, Ford threatened that any Sesolinc employee to expose the true extent of the defective wiring would be fired:

> Just in case I have not made it clear enough, the ONLY System involved in this madness are the Battery Systems.
> They are the only ones that FORSCOM or the TACOM LROs have identified.
> They are the only ones the unit wants to treat as a hard wired permanent structure.
> DO NOT ALLOW ANY OTHER SYSTEM TO BE BROUGHT INTO THE CONVERSATION AND DO NOT OPEN YOUR MOUTHS ABOUT OTHER SYSTEMS IN THE WARRANTY. DO NOT ENTERTAIN THAT CONVERSATION WITH YOUR CUSTOMES FOR ANY REASON.
> The guy that drags us into that mine field, after Ive beaten my head on the ground for 3 months to get us where we are is fired, immediately; I promise.

56.     Sesolinc has concealed from the United States that the systems built from 2011 through 2014 were defective.

### *Sesolinc Deceives the Military into Ordering Incorrect Items and Overpaying by Manipulating the National Stock Numbers*

57.     A National Stock Number (NSN) is the official label applied to a supply item that is repeatedly procured, stocked, stored, issued, and used throughout the federal supply system.

58.     Every unique item sold to the federal government—from aircraft parts to light bulbs—has its own identifying NSN.

59.     Data elements within the number include information such as an item name, manufacturer's part number, unit price, and physical and performance characteristics.

60.     NSNs facilitate standardization, to increase efficiency and identify potential duplicate orders. They are vital to simplifying the logistics for the array of suppliers and supply parts required for use by federal agencies.

61.     The NSN also promotes coordination between the military services and provides logistics managers, procurement personnel, operations planners, and industrial base assessment personnel with a standard method for identifying and tracking items of supply in-storage, in-process, in-transit, and in-theater.

62.     Sesolinc sells exteriors only, interiors only, or "complete systems" that include both an interior and an exterior.

63.     Sesolinc's sales catalogs are deliberately misleading as to whether the customer is purchasing an exterior, an interior, or a complete system; for example, it often displays pictures and includes a description of a complete system alongside the order number for only interiors (or exteriors).

64.     For example, page 54 of Sesolinc's August 2015 catalog lists a Battery Maintenance System, BAT-DSP[2], NSN 8145-01-591-7448, including pictures and descriptions of a complete system.

65.     In actuality, NSN 8145-01-591-7448 is only for a Battery Maintenance System interior.

66.     On a number of occasions, Mr. Jackson was contacted by a customer asking, in essence, "where is the rest?" and Mr. Jackson had to explain that the order was only for the interior or exterior and not both.

67.     For example, on one occasion in February 2013, the Army received three command center exteriors and had to go back and place a second order for three interiors.

68.     This is particularly profitable for Sesolinc, because it often charges more for its interiors than it does for a complete system.

69.     Accordingly, the military paid far more for three exteriors and three interiors than it would have for just three complete systems.

12

70.     In another example, Mr. Jackson recalls speaking with CW3 Devane at Fort Bliss, Texas during delivery of contract SPE8ED-13-M-0116, for three 5-door bulk cargo containers, NSN 8145-01-539-0508.

71.     Mr. Jackson explained to CW3 Devane that the unit had ordered only exterior containers, not a complete system.

72.     CW3 Devane asked him if the military could buy the interiors, and Mr. Jackson informed her that the military would have to pay the freight to ship it back so that the interior could be installed.

73.     Faced with the choice of paying to ship three 12-foot containers from Texas to Georgia and back, Chief Devane instead kept the empty containers to use as general storage and requested that two complete systems be ordered in addition.

74.     First Lieutenant Randy Bookwalter attempted to order those two complete systems for Fort Bliss. He twice made errors on this second order, first by trying to order just interiors (NSN 8145-01-530-5467), and then ordering *two more* cargo containers (NSN 8145-01-539-0508).

75.     Relator Jackson recalls that CW3 Devane was furious when she ended up with *five* containers, none of which had the interiors that she was originally requesting.

13

76.    This example epitomizes the confusion that the Sesolinc sales process causes for the military.

77.    In fact, even when the error is corrected prior to shipment, Sesolinc unduly profits because it prices its interiors higher than its complete systems.

78.    Sesolinc charges more for interiors than for complete systems so that when it has the opportunity to "customize" a system for the customer, it can gouge the military for more money.

79.    A second reason is that when Sesolinc is informed that the customer inadvertently ordered an interior as a result of its deceptive sales and marketing practices, it can amend the order "at no additional cost."

80.    The military believes it is getting a bargain from a cooperative vendor; it would be counter-intuitive to believe that the interior by itself would cost more than a complete system.

81.    In actuality, by overpricing its interiors, Sesolinc is charging more up front for the interior, and then retaining the windfall when it changes the order to a complete system.

82.    By failing to return these overpayments, Sesolinc knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

14

83.    As additional examples, a September 23, 2013 memorandum states that the military customer believed it was purchasing self-contained FMTV compatible systems and not simply interiors, and requested complete systems instead.

84.    Similarly, an October 10, 2013 memorandum requested a modification in the military's contract with Sesolinc once it became apparent that the order was for an interior configuration with no walls.

85.    In each of these cases, Sesolinc was happy to oblige "at no additional cost to the unit" because it was already making a windfall from the higher priced interiors, which it concealed from the customer and did not repay after modifying the order.

86.    In yet another example, a January 21, 2014 memorandum noted that the military had ordered a mock jail cell interior, and requested that Sesolinc hold it until it could obtain approval to purchase an exterior.

87.    Sesolinc knew that this was a constant source of confusion for DLA, as Mr. Jackson had a number of conversations with owner Harry Ford III and VP/Direct Supervisor McLawrence Williams about this issue, both of whom confirmed that they intentionally left the sales materials unclear.

15

88.    The August 2013 and earlier sales catalogs do not contain any
warning whatsoever that the structures pictured may not be what is actually
ordered or delivered.

89.    Finally, in its April 2014 sales guide, Sesolinc placed a notice: "Due
to the customizability of the product line, many of the photographs in this
Product Overview contain options combinations of multiple NSNs."

90.    This warning, however, does not appear on the actual pages with
the deceptive photographs, which still appear to correspond to the stated NSN.

91.    In addition to the sales materials being confusing as to the necessity
of ordering an interior and an exterior, it is often confusing as to *how many*
interiors must be ordered.

92.    One might think that he need order only a single exterior and a
single interior to complete a system, but that would be wrong.

93.    If, for example, the customer wants an arms room, it might purchase
the 20′ exterior — NSN 8145-01-565-6131 — and the arms room interior — NSN
8145-01-534-0438, and assume that a fully loaded arms room will arrive.

94.    In fact, that is an order for a full exterior shell, and just *one side* of the
arms room.

95.    If the customer wants a complete arms room, they must order two arms room interiors, one for each side.

96.    Furthermore, if the customer simply tells the salesperson that it wants a complete system without identifying the individual NSNs, Sesolinc will usually include a fourth NSN for ISO certification, NSN 8145-01-554-2266, to drive the costs up even further.

97.    Sesolinc also sometimes changed what the NSNs represented: from one item to another, or from a complete system to just an interior (or vice versa).

98.    There is no explanation for making these switches except to mislead the customer.

99.    As customers often place orders from older sales catalogs, or try to replicate orders from the faceplates on the systems they previously brought, this creates a great deal of confusion.

100.    Sales catalogs prior to September 2012 did not have dates on them, and so there was no way of knowing whether the catalog was recent or not.

101.    Moreover, Sesolinc did not, as a matter of policy, distribute new catalogs to the customers whenever they were updated, which was often multiple times in a single year.

102.    For example, in late 2011 to early 2012, CW2 David Lanter at Fort Carson, Colorado tried to order a Tool Room Complete System, but because the NSNs had recently changed, Sesolinc changed his order to a Tool Room Interior, and he ultimately received an SSL Parts Storage Container instead.

103.    In that instance, on or about December 15, 2011, CW2 Lanter ordered a complete Tool Room under NSN 8145-01-530-5459 and an SSL Parts Storage Container, NSN 8145-01-539-0499.

104.    The unit paid $25,302.83 for the Tool Room and $20,329.09 for the SSL Parts container.

105.    NSN 8145-01-530-5459 was the correct NSN for a Tool Room Complete System as recently as the March 2011 sales catalog.

106.    But in the December 6, 2011 sales catalog, Sesolinc changed the NSN for a Tool Room Complete System to NSN 8145-01-530-5457, and made 8145-01-530-5459 the NSN for a Tool Room Interior.

107.    When CW2 Lanter later discovered that his order was changed to a Tool Room Interior, he contacted Relator Jackson and asked him to change the order to a complete system at no additional cost.

108.   Sesolinc denied the request, and so Lanter instead modified the order to a second SSL Parts Storage Container, NSN 8145-01-539-0499 (i.e., the closest thing he could get to the Tool Room for the price he was paying).

109.   Moreover, because the customer had paid $25,302.83, Sesolinc also received a windfall on the substitution.

110.   Sesolinc did not refund the difference in price between the Tool Room Interior and the SSL Parts Storage Container, nor did it refund the difference in price between the Tool Room Complete System and the SSL Parts Storage Container.

111.   In fact, because the Tool Room Complete System cost *less* than the Tool Room Interior, Sesolinc could have given CW2 Lanter the complete system *and* refunded part of his original payment. Instead, Sesolinc allowed him to exchange the interior for an even cheaper system.

112.   Sesolinc is intentionally vague in its item nomenclature in the military's FEDLOG logistics management system so that if the customer looks up the NSN to see if an order is correct, they receive little to no helpful information.

113.   For example, if a customer pulls up NSNs 8145-01-530-5457 and 5459 on FEDLOG and compares the two, the Army Master Data Files are identical except for the prices. Moreover, the item names give no indication as to what is

19

actually offered; in this instance, both say "Container, Number One Common." There is no way of knowing that one is for an interior and one is for a complete system, or that the interior actually costs more than the complete system.

114.    Not only are they vague, but they are often wildly inaccurate.

115.    The item name for the Kudu vehicle, NSN 8145-01-615-1517, says "Container,MaintSupp."

116.    The item name for the ISO certification (which was formerly for a Vert HGT Overhead Loads Deck) still reads "Container,Vertical Roof Expansio[n]."

117.    There is no way to know from Sesolinc's nomenclature on the FEDLOG what was or is being ordered. Rather, the customer relies entirely on Sesolinc's sales staff to get it what it wants, keeping military customers deliberately vulnerable to fraud and deception.

118.    Even if Lanter had looked these NSNs up in FEDLOG, it would have provided him with no information from which to determine that he was being swindled by Sesolinc.

119.    Other examples of changing NSNs to fool the customer, in the April 2012 catalog, NSN 8145-01-591-7448 was the Hydraulic Maintenance System, and there was no NSN for a Battery Maintenance Interior.

120.    In the September 2012 catalog, NSN 8145-01-591-7448 was the

Battery Maintenance Interior and NSN 8145-01-606-2890 was the Hydraulic

Maintenance System.

121.    NSN 8145-01-554-2317: an electric stand-by refrigeration unit in

October 2011 changed to a 5 drawer parts cabinet in April 2012.

122.    NSN 8145-01-554-2266: a Vert HGT Overhead Loads Deck in

September 2012 changed to an ISO certification in or before April 2014.

123.    NSN 8145-01-554-2281, which changed from an 8.5Kw diesel

generator fully cowled/silenced to a tool set stacking, in or before April 2014.

124.    Anyone who ordered from an outdated catalog or faceplate for any

of these items would have received the wrong item.

### Sesolinc Knowingly Charges the Government Inaccurate Freight Costs

125.    Upon information and belief, Sesolinc is also abusing the NSN

system in order to tack on excessive freight charges.

126.    For example, if the systems were listed under a single NSN, rather

than unbundled into multiple NSNs, a single system would be delivered on a

single truck and a single freight charge would be applied.

127.    Instead, a single system with 4 NSNs is delivered on a single truck

and 4 freight charges are applied.

128.    Upon information and belief, this method of unbundling NSNs results in a windfall to Sesolinc via higher freight costs passed on to the Government, because at the end of the day, it is still a single delivery being made by a single truck.

129.    Sesolinc also knowingly overcharges the customer for its actual freight costs.

130.    On October 29, 2013, CEO Ford sent an internal email in response to complaints by the sales staff that they were being shorted on their commissions because Sesolinc was deducting non-existent freight charges.

131.    In that email, Ford admits that the freight quoted to the customer, and ultimately charged to the customer, does not match Sesolinc's actual freight costs.

132.    He acknowledges that he routinely quotes the military a price for freight that is "[$]500.00 higher than needed" — only $500 higher, however, because if he goes any higher "DLA transp will smell a rat." He further admits that although he quotes freight as 3 units per trailer, they can sometimes fit a fourth unit in, so that DLA is paying the freight without any actual additional costs for Sesolinc.

133.   He also explains that he averages the freight out on a weekly basis using a formula rather than actually calculating and quoting the true costs.

134.   He concludes that "we quote as much as we can, based on the RFQs and then work the reality of the Awards to minimize our costs."

### Sesolinc Misrepresents Itself as the Manufacturer of Products that it Actually Purchases from Domestic and Foreign Subcontractors

135.   Sesolinc misrepresents to the government that it manufactures end products that it actually purchases from subcontractors, or in one case, Home Depot.

136.   Moreover, some of these products were manufactured outside of America, in violation of the Buy American Act and Trade Agreements Act.

137.   FAR 25 implements the Buy American Act ("BAA"), 41 U.S.C. §§ 8301-8305 and the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2511-2518.

138.   The BAA restricts the purchase of supplies that are not domestic end products for use within the United States so that "the cost of domestic components must exceed 50 percent of the cost of all the components." FAR 25.101(a)(2).

139.   The total value of Sesolinc's GSA schedule is in excess of $203,000, thereby implicating the TAA.

140.   The TAA limits purchases of end products to U.S.-made or certain other designated countries; this designated countries list does not include China. It also requires a certification that the product is manufactured in an eligible country.

141.   Upon information and belief, as further discussed below, Sesolinc falsely certified compliance with the TAA for generators manufactured in China.

142.   Also, in the Sesolinc brochure, NSN 8145-01-615-1517 is for a 4-wheel-drive diesel maintenance support vehicle that Sesolinc calls a "Kudu." This is a small but powerful vehicle that can haul the systems on a trailer.

143.   But Sesolinc does not manufacture Kudus. In actuality, a Kudu is a Kubota utility vehicle that Sesolinc has purchased from Home Depot and repainted.

144.   It is called a Kudu because Sesolinc can remove portions of the existing "KUBOTA" label and be left with "KUDU," without having to add its own label.

145.   Although the Kudu is the most egregious example of this fraudulent scheme, Sesolinc also procures generators (NSN 8145-01-534-0701) and 4 cubic foot refrigerators (NSN 8145-01-554-2312), strips them of their labeling, and repackages them as Sesolinc-made products.

24

146.   In fact, Sesolinc repackaged and sold generators that had been manufactured in China.

147.   After Sesolinc received a number of complaints about these generators in November 2011, it found a new vendor, but it still maintains that the generators are manufactured by Sesolinc.

148.   Moreover, from approximately August 2000 through July 2011, subcontractor Metal-Con, Inc., a/k/a Lariscy Mechanical Fabricators, Inc., a company in Sylvania, Georgia, was the true manufacturer of the Sesolinc systems.

149.   Upon information and belief, Metal-Con was not a veteran-owned small business like Sesolinc.

150.   Thus, during this time, Sesolinc was little more than a middle-man that provided no actual service, while raising the costs to the military.

151.   Until March 2010, Lariscy was paid for time plus materials, and Sesolinc pocketed the profit.

152.   From April 2010 through July 2011, the parties split the contract price 50/50. This continued until Sesolinc opened the Statesboro factory in July 2011.

153.   Sesolinc actively concealed Metal-Con's involvement in its manufacturing process from the military.

154.   For example, Order #W911SG-04-F00759 for thirty-one 6612 Operations/PLL Shelters, NSN 8145-01-530-5478, going to Fort Bliss, cost a total of $88,350.

155.   Ford placed an order for these shelters with Metal-Con.

156.   When the shelters were ready, Sesolinc sent them directly to the base from the Metal-Con factory.

157.   On the bill of lading, Sesolinc put Metal-Con's Sylvania address, but falsely stated that it was a Southeastern location, in an apparent attempt to conceal the involvement of Metal-Con and falsely misrepresent itself as the manufacturer.

## COUNT I

### Violations of 31 U.S.C. § 3729 – Federal False Claims Act

158.   Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

159.   As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented or caused to be

presented numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

160.   As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

161.   As set forth above, Defendants, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

162.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

163.   The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the Federal False Claims Act, 31 U.S.C §§ 3729-3733, in an amount that will be proven at trial.

164.    The United States is entitled to a civil penalty of between \$5,500 and

\$11,000 as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims and

statements.

165.    Relator is also entitled to reasonable attorney's fees and costs,

pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II

### Violation of 31 U.S.C. § 3730 – Retaliation

166.    Relator incorporates and realleges herein all other paragraphs as if

fully set forth herein.

167.    During the course of his employment, Relator Jackson regularly

complained to Sesolinc management, including CEO Ford, that it was defrauding

the military by selling defective products, violating NSN regulations, and

overcharging for freight.

168.    As a result of these complaints, Sesolinc terminated Relator

Jackson's employment on August 31, 2015.

169.    Moreover, Sesolinc refused to pay Relator Jackson commissions that

he had earned, or reassigned those commissions to other employees.

170.    Sesolinc and Ford violated Relator Jackson's rights pursuant to 31

U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in

furtherance an action under the False Claims Act and other efforts to stop one or more violations alleged in this action.

171.   As a result of Defendants' actions, Relator Jackson has suffered damages in an amount to be shown at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a maximum civil penalty for each of the false claims and statements;

(c) awarding Relator 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relator general and special damages resulting from the retaliation pursuant to 31 U.S.C. § 3730(h);

(e) awarding Relator litigation costs and reasonable attorney's fees; and

(f) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Julie K. Bracker
Georgia Bar No. 073803

(Admission to S.D. Ga. Pending)
Jason Marcus
Georgia Bar No. 949698
(Admission to S.D. Ga. Pending)
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UNITED STATES ex rel. CHARLES JACKSON

**DEFENDANTS**
SESOLINC GROUP, INC. and HARRY FORD III

**(b)** County of Residence of First Listed Plaintiff   Russell
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Bracker & Marcus LLC, 3225 Shallowford Rd. Suite 1120, Marietta, GA 30062; 770-988-5035

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government Defendant
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ❏ 110 Insurance
- ❏ 120 Marine
- ❏ 130 Miller Act
- ❏ 140 Negotiable Instrument
- ❏ 150 Recovery of Overpayment & Enforcement of Judgment
- ❏ 151 Medicare Act
- ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ❏ 153 Recovery of Overpayment of Veteran's Benefits
- ❏ 160 Stockholders' Suits
- ❏ 190 Other Contract
- ❏ 195 Contract Product Liability
- ❏ 196 Franchise

**REAL PROPERTY**
- ❏ 210 Land Condemnation
- ❏ 220 Foreclosure
- ❏ 230 Rent Lease & Ejectment
- ❏ 240 Torts to Land
- ❏ 245 Tort Product Liability
- ❏ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- ❏ 310 Airplane
- ❏ 315 Airplane Product Liability
- ❏ 320 Assault, Libel & Slander
- ❏ 330 Federal Employers' Liability
- ❏ 340 Marine
- ❏ 345 Marine Product Liability
- ❏ 350 Motor Vehicle
- ❏ 355 Motor Vehicle Product Liability
- ❏ 360 Other Personal Injury
- ❏ 362 Personal Injury - Medical Malpractice

*PERSONAL INJURY*
- ❏ 365 Personal Injury - Product Liability
- ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ❏ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ❏ 370 Other Fraud
- ❏ 371 Truth in Lending
- ❏ 380 Other Personal Property Damage
- ❏ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ❏ 440 Other Civil Rights
- ❏ 441 Voting
- ❏ 442 Employment
- ❏ 443 Housing/ Accommodations
- ❏ 445 Amer. w/Disabilities - Employment
- ❏ 446 Amer. w/Disabilities - Other
- ❏ 448 Education

**PRISONER PETITIONS**

*Habeas Corpus:*
- ❏ 463 Alien Detainee
- ❏ 510 Motions to Vacate Sentence
- ❏ 530 General
- ❏ 535 Death Penalty

*Other:*
- ❏ 540 Mandamus & Other
- ❏ 550 Civil Rights
- ❏ 555 Prison Condition
- ❏ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ❏ 625 Drug Related Seizure of Property 21 USC 881
- ❏ 690 Other

**LABOR**
- ❏ 710 Fair Labor Standards Act
- ❏ 720 Labor/Management Relations
- ❏ 740 Railway Labor Act
- ❏ 751 Family and Medical Leave Act
- ❏ 790 Other Labor Litigation
- ❏ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ❏ 462 Naturalization Application
- ❏ 465 Other Immigration Actions

**BANKRUPTCY**
- ❏ 422 Appeal 28 USC 158
- ❏ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ❏ 820 Copyrights
- ❏ 830 Patent
- ❏ 840 Trademark

**SOCIAL SECURITY**
- ❏ 861 HIA (1395ff)
- ❏ 862 Black Lung (923)
- ❏ 863 DIWC/DIWW (405(g))
- ❏ 864 SSID Title XVI
- ❏ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ❏ 870 Taxes (U.S. Plaintiff or Defendant)
- ❏ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☒ 375 False Claims Act
- ❏ 400 State Reapportionment
- ❏ 410 Antitrust
- ❏ 430 Banks and Banking
- ❏ 450 Commerce
- ❏ 460 Deportation
- ❏ 470 Racketeer Influenced and Corrupt Organizations
- ❏ 480 Consumer Credit
- ❏ 490 Cable/Sat TV
- ❏ 850 Securities/Commodities/ Exchange
- ❏ 890 Other Statutory Actions
- ❏ 891 Agricultural Acts
- ❏ 893 Environmental Matters
- ❏ 895 Freedom of Information Act
- ❏ 896 Arbitration
- ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ❏ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729-33
Brief description of cause:
False Claims Act violations

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
04/12/2016

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____